We will now hear counsel in Government of the Virgin Islands v. Roger Edwards, No. 064139. Before counsel comes up, I just want to say for the record that the state of the appendix, or what's before us, leaves much to be understood. It's real and corrective. We have had, I don't know about anybody else I know that's in my discussion, have not been able to get a part of the record, the whole trial is not there. There are references, I'll ask you about them specifically, there are references throughout of the briefs to sidebars, arguments that took place, so it may take a little longer for us to get to the bottom of this and I want you to understand why. We will now ask counsel to step forward and we will question him. Good morning, this is Leslie Payton on behalf of Mr. Roger Edwards and I'd like to apologize to the court for being late this morning. It was a rainfall in St. Thomas this morning that was very heavy and the planes weren't flying out of St. Thomas this morning. We heard the sea plane was down and we didn't know what that meant. Just before we start, I just want to give you a little perspective in terms of my role with respect to this case. I was formerly a territorial public defender and I did in fact represent Mr. Roger Edwards in this case. And I represented him in this case. I also represented him all the way up to the, I filed the appeal in the appellate division of the Virgin Islands District Court and subsequently I retired, I opened my office in Philadelphia. And then when he and his family retained me, I tried to piece together everything that I could find, which I did not have anything because most of the files were in the territorial court and in the office of the territorial public defender. So I tried to make out the best I could do. But I will, if the court endeavors to get a complete transcript, I will make an attempt to do that. Yeah, well we also didn't know why we couldn't get it from the government. And we did, after COVID, did make some efforts and we got, well we'll get to that specifically. But anyway, welcome to Philadelphia. As the one Philadelphian on the panel. Okay. Your Honor, my first issue I'd like to deal with is the prosecutor's intentionally improper and contaminated comments to the jury with respect to his comments that I believe were not in evidence. And more particularly, comments he made to the jury concerning two defense witnesses that invoked the Fifth Amendment. And that's Nibs is one. Nibs and Tatum was the second one. With respect to the evidence that was not in, comments that were not in evidence, was the fact that this was a sexual, unlawful sexual contact case and alleged rape of the appellant's daughter by the appellant. And this case rested basically on the testimony of the, at the time I believe she was 11 years old. At the time that she testified, not at the time of the event. Right, at the time she testified. At the time of the event she was between 6 and 7. Yes, that's correct. And so the testimony rested on that. So the jury had to determine the credibility of all the defense witnesses, the government witnesses, and as well as the credibility of the alleged, well the victim in this case, which was the 11 year old child. This court has stated that prosecutors cannot bolster a witness's testimony. You can't call a witness a liar. That's what defines a fact. This court has stated that the strength of the evidence against the defendant must be in evidence. In the interest of instruction, the court, I can, I believe I object to it, your honor. Yeah, but what is it that you say now that the prosecutor did that was improper? Number one, I believe that he said in the transcript, as I recall it, and from the case that the witnesses were criminals, they invoked the Fifth Amendment. That's what I believe that he said, and that's what I think. He said, you think the prosecutor said the witnesses were criminals? Yes, and I believe in the transcript that bears up mine, I believe he made a comment about Tatum and Nibs taking the Fifth Amendment. Was that in your opening brief? Pardon me? Was that in your opening brief? Yes, yes. Now, this leads into my second issue with respect to the two defense witnesses taking the Fifth Amendment. The Virgin Islands statute clearly says that there's immunity for persons such as Ms. Tatum and Ms. Nibs if they make a report of any unlawful sexual contact or any misconduct that they discovered upon the child. But did you put a proffer in the record as to what they were going to say? I can't find what they were going to say in the record. Did you make a proffer at that time, Your Honor, if you will give her immunity, this is what she will testify? Yes, I did, and I even asked the trial judge, Your Honor, to impose immunity for the two witnesses. And the trial court declined to do that. The underlying question really is whether M.E. ever said to Nibs that the molestation never happened after initially saying that it did. Is that the bottom line? That's the bottom line, yes. And I can't find where that information was ever proffered at trial. That information, Your Honor, was given, I believe that was part of the discovery that we received from the government, wherein Ms. Nibs gave a statement wherein she said that, in fact, M.E. stated to her in conjunction with Ms. Tatum, because they used all babies to ascertain whether or not there was molestation. Nibs gave a statement, go ahead, keep going with that part. And Nibs testified or gave a statement that they used all babies to demonstrate whether or not molestation took place. And, in fact, after questioning M.E., Ms. Nibs and also Ms. Tatum concluded that there was no molestation. Well, did they say that M.E. said that the molestation never happened? I mean, now you said they concluded that, but that's a little different. Okay, I cannot recollect the record, Your Honor. I can't find that. And the Superior Court gave an opportunity to make a record, and nothing was produced. There was no evidence of recantation that you reduced, right? I stand to take exception to that, Your Honor. I believe specifically that I was very much involved in this case, and I believe that there was a statement that was made by Ms. Nibs and Ms. Tatum that they believed that M.E. was not molested by her father. Yeah, but didn't she – she said – well, go ahead. Wait a minute. We're getting two things – we're getting me confused. I'm not two things. I'm getting two things confused. One of them has to do with I thought we were talking about Nibs and Tatum and the failure to grant them immunity at trial. Right. And that's a certain – that is an entirely different issue, at least chronologically, from whether Melissa recanted after the trial. Right. Well, let's talk about Tatum and Nibs. As I understand it, Tatum did testify, and she said basically Melissa told me – M.E. M.E. M.E. M.E. told me that her father had abused her. I did not believe her. Correct. Now, is that the extent of – is that what Nibs would have said? Why did the defense call these two women? These two women gave statements, as I recall. In their statements, they stated they questioned M.E. M.E. recanted and said that there was no molestation. They demonstrated by using doll babies, lifting the doll babies dressed and so forth. And when was this? This was, I believe – well, it was – They said she recanted before trial. Yes, before – it definitely was before trial, Jana, and this is what I want to introduce at trial. And the government said, if you testify, I'm going to prosecute you, which intimidated them. They all went out and retained private counsel, which was Mr. Jackson. Now, Title V of Section 2533 of the Virgin Island Code states specifically, any person, official, or institution participating in good faith in any act permitted or required by this subchapter shall be immune from any civil or criminal liability that otherwise might result by reason of such action. Mr. Payton, where is the evidence that the government threatened the two women with prostitution? Is there any such evidence in the record? Yes, it's in – I believe it's in Volume 1 of the transcript, Jana. That's very specific, and even in the government's closing argument. Well, wait, wait, wait. Let's find the evidence. Did we have – this is the one case, Bill, where we told you we wanted the whole record. Where is it? Okay, let's get it. It should be up here. I had it – Because we didn't have it. Oh, it's not in the courtroom. Go ahead, bring it. We asked for the whole record, Mr. Payton and Mr. Phelan. Okay. I'm looking at the Joint Appendix, page 104, Jana, and 105 of the Joint Appendix. That was on the appendix. Yes, and if you look at Joint Appendix 104 – and I can read the section where in the trial the prosecutor stated to the court what he intended to do. Go ahead. And it says here, Jana, it says here – This is a colloquy, and this is Attorney Jackson. This is Attorney Jackson. And Mr. Jackson was concerned about his clients. He said, Jana, I'm here on behalf of two witnesses that have been suspended by the defense, specifically Ms. Deborah Nibbs and Ms. Sheila Tatum. The defense wishes them to testify regarding statements made by the victims, in this case regarding alleged incidents by Mr. Edwards. There is law, Jana, that specifically says that certain professions, school personnel, social service workers have an obligation if they have reasonable cause to believe that sexual abuse – Yes, that's the point. Where is there evidence that the government threatened them? Well, Jana, your position would be to oppose that. Our position is that it was asked by Attorney Jackson whether we would be willing to grant immunity in terms of the government granting immunity, and we said we would not. We would not. But obviously I'm not sure. I haven't researched this issue as to whether the court has the authority to grant immunity or not. I will be honest with you. The government is not willing to grant immunity. Well, why is the failure to grant immunity equivalent to a threat to prosecution? Well, Jana, I believe that it is here in the quality. I should have pointed that out. Let's take it as a given that the government didn't want to grant them immunity for whatever reason. Why is that a threat to prosecution? You said that the record shows that the government threatened to prosecute them. Where is that? Jana, I believe it's in the record. I cannot look at it at this time. Well, what you just told us, Mr. Payton, what you just told us would show it. It doesn't show it. It doesn't show a threat by the government to prosecute them if they testify. Well, Jana, I've been involved in this case to the extent that I cannot recall every single conversation. In this conversation here, what the prosecutor intended to do, and he said he didn't research the issue, but he said he wasn't granting any immunity. He didn't know. We have a case. I can't remember who wrote it. It had been Judge Barrett or the government, the U.S.C. Smith. The ability of the court to grant immunity. But, frankly, I don't see a threat. Maybe my colleagues do, but I don't. Why don't you go on with this? We have one case that's not on, so we have a little more time. Why don't you go on with the next argument? I appreciate that. Okay. Walter, does that take care of that part of what you said? Well, yes. More or less? Okay. Let's go on. Okay. Now, what is the evidence of recantation? Pardon? Is there any evidence of recantation that's on the record? He's talking about we're moving now to after the trial. It appears that the defense counsel informed the court that he had a Ms. Walters. Right. And the trial court asked for a proper, and counsel said that she would testify that Melissa told her it was a complete lie, that it was untrue, and it was a complete lie when she stated Mr. Edwards was having sex with her in the presence of her sister. Now, later there was a hearing, and defense counsel informed the court that Ms. Walters was present at court and was prepared to testify, and he was going to call her, and the court, for reasons that I can't find in the record, actually the court says my law clerk called your office and said that Ms. Walters was not going to be permitted to testify. But I can't find anything in the record as to why the court would not allow Ms. Walters to testify about recantation subject, subsequent to trial. Do you know? No, I don't, Your Honor. And I was surprised when I, because I must have had been in between our office and the court, and when I got to the court, I met Ms. Walters there. She was ready to testify, and the judge asked us if we were ready to go forward, and we said yes. I have Ms. Walters, and he said, well, I'm not going to listen to Ms. Walters. And I said, why not you? I'm not going to listen to her. So, you know. You didn't call her? Yes, I did. Yes, I did, but the judge refused to allow her to testify. So. Yes, yes, the judge said she wasn't, he was not going to let her testify. He didn't give me any reason. Maybe government counsel will have some memorandum. He didn't give me any reason at all. And the next issue I would like to go into, and I know I'm taking up the court's time. No, no, we're asking you the questions. Go ahead. I want to follow up on my question, if I could, sir, please. Yes. I'm talking about Ms. Walters now. The judge said everybody's present in the courthouse at a hearing. He says, I'm not going to hear Ms. Walters. Right. They go on and they talk at the hearing. Excuse me, Ms. Watley or Ms. Walters? Walters. It was Walters. Okay. And there's a discussion. Ms. Walters is not called. And they have a discussion about a number of matters. Ms. Walters, yes. And the trial court and the appellate division said that's not a problem, as I understand it, because you were given an opportunity later at that hearing to present witnesses. But the only thing in the record, subsequent in the record, is the court asking you whether you wanted the government to put M.E. on the stand. And you said, I understand you needn't do that. I understand your ruling. I take exception to your ruling, but let's move on. Is that clear? Is that consistent with your understanding of what happened? That is consistent with my understanding of what happened. This case was a politically charged, community-wide case, and in the heat of battle, to be quite frank with you, I did my best to bring forth my witnesses. The court was opposed to it, and I was at a loss at that point in time what I could do legally in the framework to put forth the best case I could. Well, let me follow that up. Let me understand that. That when you did have the opportunity to call Phyllis Walters, you didn't have her testimony. Is that true? No, he never had the opportunity. I never had the opportunity to call her because I asked to call her, and the court said, no, I'm not going to listen. Yes, the judge flatly told me he wasn't going to do that. And, you know, I can't, you know. Okay, all right, let's move on. The other issue in this case is that there was a Ms. Watley. Now, I remember because I was so, some things I remember clearly as Bell, in this case, but Ms. Watley, I clearly remember Ms. Watley because Ms. Watley had a fraternity suit against my client. And when she walked into the courtroom, you know, he said, oh, my God, you know, this is one of my old girlfriends. I said, okay, be cool, let me go and find out if she's going to testify. I walked over, I asked her, are you testifying in this case? I said, are you going to testify in this case? She said, no. Now, during the course of this trial, I didn't look back every minute to see if she was there or if she was not. I was surprised when the government called her as a rebuttal witness, and I objected on the record. And the trial judge said, over my objection, she's going to testify. And she testified against Mr. Edwards. And he said it was his recollection that she was only in the courtroom, I believe, during Dr. Lloyd's testimony. Now, what I think the trial court should have done is not rely upon its own recollection, but ask a marshal, ask a law clerk, or even ask the stenographer. Don't rely on me. And don't even rely on your recollection. Did you ask the trial court to do that? I can't recall. I don't see that. Yeah, I can't recall. I mean, all I see is that the court observed that Watley was present only during the testimony of Dr. Lloyd and that the testimony and that Lloyd's testimony was unrelated to Watley's. The appellate division noted that. So I don't see anything in the record to show that you demonstrated that she was present during his testimony. I mean, unless you can show it to us, the record doesn't show that. Okay. What other major points do you have? The other point, Your Honor, is the voir dire. There was a Mr. Powell and there was a Ms. Powell. Mrs. Powell, there was a several series of questions that the trial court posed to prospective jurors with respect to whether or not any of their family members were involved in any rape case or sexual assault. That's right. Any close family members. Yeah, any close family members. And no one stood up. After this trial was over, this same young lady, M.E., had a trial with a had alleged unlawful. Another defendant. Yeah, another defendant. We know that. And Ms. Powell testified. Ms. Powell said that, yes, I have, I believe, I have a family member that was involved in a rape case. And she also said she wouldn't be biased, right? Yeah, she wouldn't be biased. Well, how can you show a but-for-cause challenge? Well, Your Honor, I think it's, to me, Your Honor, I look at this in this very basic form. If I'm a prospective juror, and I know that I have a close family member that has been involved in a sexual assault case or a rape case, and I sit there on the first case and says, no, I mean, don't even inform the court. Then in the second case, you inform the court, yes, it's sort of suspect. Maybe you had something against this particular defendant, you know, as opposed to this defendant. Mr. Payton, the territorial court, you didn't put in the appendix where according to the territorial court, Virginia Powell apparently discussed her family member's rape at side court. That was page three. And so that was a territorial court citation. So we have the clerk's office write to you, and you faxed us a page three that has nothing to do with this. No, that was, Your Honor, the page three. I was wondering why the court wanted that page three because I didn't see any examination as to the court's question. Where is something where Powell discussed her family member's rape at side court? Do you have anything that shows that? Or is that the government's argument? No, my recollection, Your Honor, that Ms. Powell never said anything about any family member being involved in a rape case or sexual assault case at side bar in this case. Well, even in the other case. Does anybody have anything to show that? We're just trying to get to the evidence. Your Honor, I know that that should have been included in the appendix. We can't find it. And that's why we wrote to you. Actually, let's be more specific. We can't take a look at something that happened in another case elsewhere. What we're interested in is what this judge was told about what Ms. Powell said in the other case. And that was in my motion for a new trial, which was under the Federal Rules of Criminal Procedure 33, which the Virgin Islands Superior Court now has adopted under Rule 7. And those were one of the issues that I raised, in addition to discovery issues, which we believe the government failed to give us proper discovery Well, I think you're way over time. I think we have to limit ourselves to the question that Judge Stapleton asked you, and I'm not sure what I'm answering. I don't have a question pending, but I want to ask just one more question, and then I'll stop. As we noted earlier, the two questions that were put to Ms. Powell in this case and the other case were not identical questions. The question put in this case was, does anybody have a close family member who has been a rape victim? And the qualification about a close family member was not in the question that was put to the other jury. So it's quite possible. Do we have any reason to know that what caused Ms. Powell to answer the question in the second case, and not this one, was because the rape victim in her family was not a close family member? No, I don't know. Okay. Thank you. Thank you very much. We'll hear from the government on the VI. Thank you. Good morning. Good morning. Matthew Phelan, Assistant Attorney General, on behalf of the people. In regard to the issue of testimony or the voir dire for Ms. Powell, what I would point out is that if you look to the defendant's brief that's sent to the court, you'll see that he's transcribed various parts of the transcript, and there's question from the court, blank, question from the court, blank. Then it goes into question from the court, jury response, silent. So you're led to believe for those other places where he didn't say jurors, silence, that they didn't say anything. But then when you go in and look at the appendix that was provided, it actually states that people did raise their hand and the judge said, okay, we'll start from over here. And so what is going on in the transcript that's provided, it says a Ms. Webster that was the one who was answering those questions, and then the defendant makes reference to Ms. Powell in the Foy case, and the Foy case is the one where he says she then all of a sudden remembered. Now Judge Hodge wrote a trial memorandum, and in that footnote as you stated, Your Honor, he referred to page three of the transcript. And I think where the confusion comes from, what I was able to find from the trial court's file that was in storage, that the transcript was actually ordered by Judge Hodge of Ms. Powell's lawyer. And so if you read along with the transcript that defense counsel ordered as opposed to the transcript that Judge Hodge ordered, and they're both prepared by the same court reporter. The questions are the same. There's even one where I think in the official transcript that he ordered, there's a question from, it states, Mr. Gimbus, what did you say? And he goes, okay, let me make this more clear. Da-da-da, and he asks the question. And so the question, then hands are raised, and he refers to Ms. Webster. And the one that Judge Hodge received, he says, now as you've heard this case involves a sexual assault. Is there anyone here just because of the nature of this case, da-da-da? And on this one it says, voice from the panel, could you repeat that? And the court says, okay, let me get more specific. Is there any member or someone who's had a close family member who's been a victim of a sexual assault? If you need to approach sidebar on this, feel free to do so. There's a hand raised. It says, okay, let's start from over here. And the transcript that I have that's signed by the court reporter person is Ms. Powell. And it's Ms. Powell, and she says, yes, I request sidebar, please. Come forward. Ms. Powell says, I have a sister, Sonia Filbert. She was raped by my cousin. Okay, would that incident cause you not to be fair and impartial in this case? No. Very well. Thank you, Ms. Powell. Sidebar conference ends. Is that on the record in our case? That's this case you're talking about. Yes. Well, can we be provided with that? Yes. I will make copies of it. I found this after I filed the supplemental appendix. Okay. The reason why I think that now if you put everything together and where the confusion comes from, you look at what Ms. Powell said in this case in front of you. You look at what she said in that other one. In the other case, they said, do you have a family member? And she said, yes, I have a close family member that was raped by another family member. That's consistent with what she told the judge in this case? Yes. Okay, so that there's no inconsistency, right? Correct. From your standpoint. And the judge said you can stay because you say it's unaffected. Right. Okay. I would like, I don't know, are you going to say, is your office here? St. Thomas. St. Thomas. Well, Bill, can we get that Xerox for us here so that we will have it? I just don't want to have any more of this going back and forth. Okay. Thank you very much. Next point. Would you give it to Mr. Yes. Did you say next point? No, next point. Oh, next point. I did not say next point. Okay, thank you very much. We will proceed with you. As far as prosecutorial misconduct, I think on this one, there really isn't prosecutorial misconduct at all. On one side, the argument is made that this is really an invited response, that based on the closing argument from the defense, they basically said that Emmy acted like she was in a play. She rehearsed her lines. Basically, she's a liar. So Attorney Dick, on behalf of the government, in his closing said, he's a liar. Now, he can back that up because the defendant testified and said, there's no X-rated porno videotapes in my house. The police officer gets on the stand. We found X-rated porn videos in his house. So Attorney Dick was entitled to say, I'm going to tell them the truth. Now, the second point is, is it so outrageous that he called her or he said that the defendant used this young girl as a sex slave? I say, absolutely not. I can't think of a better definition than what happened to this child being a sex slave. We can all day long say that the defendant was charged with 11 counts of sexual assault. But you look into the record, and you look into what this girl said, and it's horrible. It's absolutely horrible. She had to sit in the witness box in front of a judge, a court reporter, 12 jurors, a crowded courtroom. She had to identify her own father. She had to testify, he licked my vagina. That wasn't objected to either, was it? No. In the time period we're talking about, she was seven years old in third grade. She then went on to say that we watched sex videos together. What happened then? Well, then we would have them up. Well, we've read that part of it. But it needs to really be understood because we can look at these terms of sexual assault and so clinical and clean cut, and boy, there's really been a rash of threats. What about this alleged recantation? Can you tell us a little bit about that? Why doesn't the child judge permit, was it NIST? Mrs. Walters was in court prepared to testify that Emmy had said that it was all perjury, it was all false. Wasn't there a government objection that she was available? This is supposed to be newly discovered evidence. Wasn't there a government objection that that was known prior to trial? And on the basis of that, the court didn't permit her to testify. Am I right or wrong? I'm not sure about that, Your Honor, because the events of the recantation that I'm responding to are when the jury went out to deliberate. In the hallway where she said she loved him. And everybody testified that's all there was, that there was nothing she said. And yet that was not what the representation was by the defense. She missed her father and that she loves him. She apologized for what she did. She said that she missed her father and she loves him. And at that point in time, Judge Hodge did offer the defense the opportunity to have a hearing. And even the prosecution brought Emmy to the courtroom. And she was available for examination as well. And he said, no, I'm not going to rehash the whole trial, Your Honor. And Judge Hodge said, no, no, we're not rehashing the whole trial. This is your deal. You asked for it. You have an opportunity. Yeah. So he said, no, no, I just make my exception on the record. To me, that's a waiver. A waiver of what? He said he had a witness there that was prepared to say, i.e., Mrs. Walters, who was prepared to say that Emmy had recanted and said what she had said in court was the lie. And there was no, and the judge would not hear. You agree that the judge said he wasn't going to hear Mrs. Walters? I believe so, yes. Okay. And do we have any idea of why the judge said that? Because I don't see how it, well, if we don't have any idea of why the judge says that, don't we have to send him back for another hearing so that he can hear Mrs. Walters? I don't understand. You perhaps said it was cured, but I'm not quite sure I understand how it was cured. The judge said, do you want to put, to have the state, the state has offered to put Emmy on the stand. Do you want me to require them to put Emmy on the stand? And he said no. But why is that, why does that cure his previous proffer of a witness with personal knowledge, allegedly, where he was told I'm not going to listen to your witness, by the judge he was told, right? Well, the court was saying, and I'm looking at District Court Appendix 173, District Appendix 1, which would be a transcript number 36. I said that is what it is. If you wanted to get a hearing and put him under oath, the defendant, and have the court make a finding on it, I would be prepared to do that. Him? Yes. The defendant? Yes. He didn't hear the alleged recantation. No. Supposedly she went up to him. See, this is the one in the hallway now. Yes. You have witnesses now. This is your motion. I'll let you put on whoever you want. You said certain statements were made to the mother of the defendant. If you're going to show that, let's go so the court can make a finding. And then, as I gather it, these witnesses were not available to testify, and the court then invited the defense attorney to have Edwards testify about the hallway incident. And the defense attorney refused. After further discussion about the alleged recantation with the defense attorney and the prosecutor, the court concluded that the victim had not recanted. Rather, it found that she had simply apologized to her father for testifying against him. Is that what happened? Yes. Yes, but I thought we're talking about Ms. Watley. Ms. Walters. Walters. Hillis Walters. Yes. Also during the hearing, Edwards' attorney asked the court if he could call Hillis Walters to the stand. The prosecutor objected to Walters testifying on the ground that the defendant could have discovered her testimony prior to trial since the alleged conversation between her and the victim took place before trial. Now, this is an entirely different thing, okay? And the court did not let Walters testify, although it permitted Edwards' attorney to make a proffer as to what she would say. And the reason for that was it was known prior to trial. It could have been discovered prior to trial, and it was not after discovered evidence. Am I correct in all of that? Yes. And the other issue is that there were some defense witnesses that were not put on the list and were not presented to the court during Hawaii. They were allowed to testify. So you're saying she could have been called if they wanted to during the trial. Yes. Okay. And the final thing as far as the recantation, I think if the court has any doubt about the in-court hallway one, I think you look at the sentencing and the defendant's own mother when she came forward in front of the court, and she told the truth. She said, Melissa came up to me, and she was crying. She said, I'm sorry. I still love you. I still love Daddy. And the grandmother, the mother, said, you shouldn't talk to me. Go talk to your father. And the mother at sentencing says that's what she did. Judge Hodge says, finally, I'm getting it straight because that isn't what was represented to me before. So I think based on that, that's unsworn testimony, but that's the defendant's own mother speaking on his behalf at the sentencing. Is it your understanding, there's some suggestion here that Ms. Walters did not testify because it wasn't newly discovered evidence. When did Ms. Walters claim there had been a recantation? Was it not post-trial? I believe her testimony was going to be in an event prior to the trial. Correct. That's my understanding of this whole thing. There are two separate incidents. Right. Can you help us with where that is in the record? I think the record is abysmal. We agree. But that doesn't help us answer Judge Stapleton's question. Is there anywhere that we can find when Ms. Walters first stated to somebody that M.E. had said this didn't happen? When the alleged recantation had occurred. And you can't help us on that. Wait a minute. You can't help us with a record site, but your recollection is that Ms. Walters was talking about a recantation that happened prior to trial and not after trial. That is my understanding of what happened. Was there a proffer placed on the record? The court gave the counsel an opportunity to make a proffer. Edward's attorney could make a proffer. Never did. There was no proffer at that time, so this was not preserved. No. Never a proffer. And what would the effect of that be? It did not follow the standard of review because part of the standard of review is that the defendant has to make a proffer. But you will prove by this witness. Exactly right. The court rules against you. You should place on the record what the witness would have testified. Yes. Do we have the record there? Yeah, we do. I mean, I have the trial. Edward's counsel stated he intended to call Mrs. Walters to the stand. The trial court asked for a proffer. Appendix 2 at 19-20. Edward's counsel proffered that, quote, she would testify that Melissa told her it was a complete lie, quote, that it was untrue and it was a complete lie, end of quote. What? But that tender may have been that that recantation was a pretrial recantation. How about that, what Judge Stapleton just asked you? Did that happen? I'm looking to see if that's addressed in Judge Hodges' opinion. Thank you. Well, let's move on. Let's go back to where actually you haven't gotten to it yet, but Ms. Tatum and Ms. Nibbs and the failure to give immunity. I had not so understood before, but now I understand that the defense wanted to call these witnesses because and made a proffer that they would testify that M.E. told them about the subsequent to that recanted and said it was a lie. In response to that, I would say the defendant was charged with 11 counts. The 11 counts were spread over three different time periods at three different locations where the defendant lived. The defendant was found guilty of all the counts as to the first location as to when M.E. was seven years old. Not guilty as to the time period for Tatum and Nibbs to testify, number two. Not guilty for time period number three. So what they would have testified to goes to charges against the defendant that he was already found not guilty for. Wait a minute. You're telling me that he's alleged to have done a series of sexual abuses here, here, and here. Here, here, here for the record means different time periods. Time periods, yes. He was convicted of the first. Yes. He was not convicted of the next two. Correct. You say that a witness who gets on the stand in the second or third time period and said, yes, I've heard what M.E. said here in the courtroom, but M.E. said to me that she had previously told me the same story, but she confessed that she made the whole thing up. Now, that's not relevant to whether he was guilty in this first time period. If there's a witness that says that M.E. recanted the whole thing? In my supplemental appendix, I presented her testimony, M.E.'s testimony, where she stated how that happened, that she said, yes, I did tell her. She called the other woman in. There was an issue with the doll, and then she said, oh, no, never mind, forget it. And it's understandable. You have to take into account that you're talking about, at that time, I believe she was nine years old. She's living with her father. She's under the sway of her father. It's very intimidating. She's talking to these people. It's definitely on the record. It was clear that she was not. I'm sorry. I don't mean to interrupt, but I'm lost. I thought that the question went to the testimony of the two women. I don't understand how your answer corresponds to the question. I understand you're on. What I would say, also, is that Judge Hodge, specifically, on the record, said there was no doubt they were going to plead the Fifth. And so he said, I don't want one mention of the Fifth in front of the jury. I don't want anyone to talk about that. And so there was this long call of plea. Everyone's going back and forth. And so he says, look, I'll let you get the police reporting. And Attorney Dick said, well, Judge, that's hearsay. I'm going to say no. I'm going to say that they're unavailable. You can get that in. So the judge handed it to him. You can get it in this way. He chose not to. Instead, he called them within the fourth question. The Fifth Amendment was out on the floor. These people chose to have private counsel. They retained private counsel. There's no obligation on the part of the prosecutor to grant them immunity. And there was no threat. There's nothing there. He says, if they testify, they testify. I'm not granting immunity. But I understand his position today. It's that the failure to grant immunity can be equated with the threat to prosecute. Is that what you understand? That's what I understand his argument to be. And I don't think that that's the same thing. Attorney Dick just said, if they testify, they testify. I think he specifically said that. No, I think the briefs indicate that their attorney instructed them not to testify because of the absence of immunity. That's what I understand. Well, Tatum did testify. Correct. But also, I mean, she sought private counsel. Private counsel instructed her that the reporting requirement may apply to her to be on the safe side and plead the case. Okay, so that's what I just said that I understood. Maybe there's nothing to be arguing about here. What did you say Ms. Tatum testified? Did Ms. Tatum testify to what the defense wanted her to say, that is, that M.E. told her that she'd made the whole thing up? No. Because at that time she was invoking the Fifth. Well, that's different from saying what the judge said. Ms. Tatum invoked the Fifth and therefore did not testify to that effect, that there was a recantation prior to trial. That's correct, Your Honor. Did she testify to anything? I believe within the third question of where do you work, I plead the Fifth Amendment under the advice of my counsel. But she really didn't testify. She just took the stand. And to say that she testified, I understand it is a reaction. Because then Judge Hodge said, oh, go ahead, you can answer that. And so she proceeded to answer some questions, and then her attorney jumped up at one particular question and said, Judge, I think there's a misunderstanding that when you said it's okay for her to go ahead and testify, you know, not for this one. Because Judge Hodge had said, you know, work out a signal, something with your client. In other words, she never testified one way or the other as to the alleged recantation? No. I mean, yes, I am correct that she never said that. Correct. Okay. Does a trial court have the power when the defendant says, look, Your Honor, there's only one witness against me, and I have two witnesses here that are willing to say that the government's witness said that her whole story was fabricated, but they're going to take the Fifth because of the statute. Does the court have the authority to say I'm going to grant immunity in fairness to the defendant so that the jury can hear everything there is to know about the government's witness? My understanding of the law is that a trial judge has the authority to grant youth immunity. However, it's usually called into play when there's an issue of prosecutorial misconduct. It's my understanding of the law under Smith that the court can do that if the court assures itself that the testimony will be exculpatory. I think that's a prerequisite for the grant of youth immunity. And that's from the decision of our court in Smith. So is it exculpatory to say, you know, she recanted her testimony, but I wasn't there when she alleged that these acts occurred? It really just goes to the truthfulness. Well, what did you just say? Is that what Payton testified to? What you just said? No. He's saying that a recantation, a testimony with respect to a pretrial recantation of the state's only witness is not exculpatory. No, not the state's witness. The defense witness. What do you mean? They were defense witnesses. No, you're saying that two defense witnesses who wished to testify that the state's only witness prior to trial recanted everything she said, the testimony of those two defense witnesses is not exculpatory. No, because we're talking about a different time frame. So it's just an issue of credibility that you're talking about. And you think that this is susceptible. Their testimony is susceptible of the interpretation that M.E. was recanting with respect to this time period and this time period, but wasn't recanting with respect to the first time period. Is that what you're saying? There was no conversation about the first time period. And the other thing, I don't believe that there was an objection from the defense. And, again, I say to the Court that Judge Hodge offered another way to get around this whole issue so that it doesn't become a gooey mess like what we have now. He said, just let the police report in. Just let what? The police report in. The judge said, I'll let the police report in. Attorney Dick said, no, that's hearsay. He said, no, I'll say that the witnesses are unavailable and, therefore, I'll let it in. And did he let it in? The defense never tendered it. Okay, Judge Van Antwerp can tell us something about the record. Now, I'm in the first volume, Joint Appendix Volume 1. Let's turn to page, lower right-hand corner, it says JA 150. Can anybody turn to that page? Anybody need help? Well, I'll read it. I've got to read it, but I think the counsel should follow along because I'm trying to figure out what the heck is going on here. The office was told by my law clerk personally, told you when the sentencing would be. Your Honor, the law clerk left a message, this is Payton, left a message on the machine stating that Ms. Walters would not be allowed to testify. However, Ms. Walters is here for two purposes, the court. Well, sentencing isn't today, and she's not going to be allowed to testify. Attorney Payton, if Your Honor has ruled, you have made that ruling, and counsel understands that I will move forward. The court, make a proffer of what she would testify to. Attorney Payton, the proffer that she would testify to is that Melissa told her that it was a complete lie, that it was untrue, and it was a complete lie when she stated Mr. Edwards having sex with her in the presence of her sister. That was a complete lie. I did not know anything about that, Ms. Walters, until they called me because they said her conscience was bothering her and she should have come forward, and I think that would be derelict of my duties if I did not bring it in to present to the court. Mr. Dick, I don't recall any testimony that she stated in the presence of her sister, the father molested her. I don't remember any testimony to that effect. Attorney Payton, no, I said Ms. Walters in the presence of her sister, not Melissa's sister. Had Melissa's sister been here, Melissa would have told you that Melissa recanted. She's not here because of a change in schedule at the court. Ms. Walters is who in relation to the child? Attorney Payton, Ms. Walters is a friend of Mr. Edwards, and from time to time they took care of Melissa. That's my understanding. Attorney Dick, this is an individual that the defense had easy access to prior to trial. If there was someone that Mr. Edwards used for a part-time babysitter for his child, well, if Mr. Edwards was not aware of the conversation Ms. Walters had with Melissa, how would he know? The court, you have made your proffer. Now go ahead. I'd like to move on and so forth. Now, can you explain that? What's going on here? Well, he made his proffer and then didn't follow up. The court said, you've made your proffer, now go ahead. And nothing further? No. You mean he should have called her? Is that what you're saying? Or at least the discussion should have continued. As to when and where and who said what? Is that what you mean? Because then he goes into Ms. Young. That's on the next page. Yeah, he goes to a different topic. So you're saying he didn't develop it fully enough? Exactly. I mean, the judge said, okay, you've made your proffer, now go ahead. And you don't construe go ahead to mean go to your next point. You construe go ahead to mean continue along this point. Yes. Certainly could have asked. Okay. All right. I think is everybody satisfied? Mm-hmm. Okay. Thank you very much. Mr. Payton is reserved two minutes, but on a bottle it may take longer. Thank you very much. Thank you. If you don't mind me asking you first out of the starting box here, you've heard what the government just said with regard to what I just read. What do you say? What do you say with regard to that? In a nutshell. In a nutshell. Because I clearly remember this conversation. Because Ms. Walters, and if you've seen Ms. Walters, and I'm not trying to be disparaging. Anyway, if I'm getting right to the point. Ms. Walters was present. The judge said he's not going to hear from her. Ms. Walters weighs about 500 pounds. We had to get special transportation to her to the court, and the judge said no way, no how. Basically, she was not going to testify. That's what happened. But the suggestion has been made that that ruling was because her testimony was available prior to trial, and the defense just didn't come up with it. That's not so, Your Honor. Okay. And, Your Honor, when a trial judge tells a defense attorney, your witness is not going to testify, what do you do? No, no, that's not Judge Stapleton's question. Judge Stapleton's question says, how do you answer the argument that the court ruled because it was not after discovered evidence? Now, I think that was Judge Stapleton's question. Let's stick to that question. All right. I'm sticking to the question, and as I recall, I don't recall that it was – I believe it was after discovered evidence. Now, to answer your question. Do you know why did the court believe that it was available beforehand? I really don't know. The government objected on that ground, didn't they? Pardon me? I just read that. The government objected, didn't it, on that ground? No, there's no question that the court – Incidentally, I don't believe the record will reflect it, but M.E. wasn't available either. The only witnesses that would go forward on that given day was Ms. Walters. So M.E. wasn't available either, and the government would not give me the address for Ms. Walters. Is that in the record? No, it's not in the record. Well, how can we take cognizance of it? Yeah, and this is my second point, and I won't belabor this point anymore. If the court is confused as to the record, because I will endeavor to seek an entire transcript of these proceedings. I think we now have it. Bill, is that right? Thank you. We now have the entire record, which we will have to go through. Okay. Thank you very much. Thank you very much. May I be excused? Yes, I think so. Okay. We have one more case. Let's do it. Okay. Okay with you? Yes. I think we have to. Okay. The final case.